**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KATHERINE SWIDNICKI,** | ) | |
| | ) | **Case No.  1:12-cv-03987** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Judge Harry D. Leinenweber** |
| | ) | |
| **BRUNSWICK CORPORATION,** | ) | |
| a Delaware Corp., | ) | **Magistrate Michael T. Mason** |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

NOW COMES the plaintiff, Katherine Swidnicki, by and through her attorney, Steven C. Kyriazes, P.C., and submits the following in opposition to defendant's motion for summary judgment.

**TABLE OF CONTENTS**

Page        Description

3.          Facts – Background – Plaintiff's Name

3.           Plaintiff's Peformance Reviews, Wage Increases and Recognitions Under
            Nichols Compared to Performance Reviews and Performance Deficiency Notice
            Given By Terrien

7.          Argument – I. Standard of Review

8.          II. Plaintiff has sufficiently exhausted administrative remedies to allow her
            related state law claims to stand.

8.          III.  Plaintiff has made a sufficient initial showing to sustain her federal and state
            law claims of discrimination, retaliation and sexual harassment.

9.                    A.        Plaintiff's Claims of National Origin (Ethnic) Discrimination

12.                   B.        Plaintiff's claims of retaliation

14.                    i.      Retaliation through increased badgering of plaintiff by
                               Terrien

14.                    ii.     Retaliation through denial of work opportunity

15.                    iii.    Retaliation through false statements in and placing
                               plaintiff on the PDN

18.                    iv.     Retaliation through termination of plaintiff's employment.

18.            C.      Plaintiff's claims of sexual harassment – hostile work environment

18.                    i.      Facts specifically regarding plaintiff's sexual harassment
                               claim

22.                    ii.     Argument

26.            D.      Constructive Discharge

28.     Conclusion

## **TABLE OF CASES**

1.      *Holland v. Jefferson National Life Insurance Co.*, 883 F.2d 1307 (7th Cir. 1989) – pg. 7

2.      *Tolentino v. Friedman*, 46 F.3d 645, 649 (7th Cir. 1995), *cert. denied*, 115 S. Ct. 2613
        (1995).  – pg. 7

3.      *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993).  – pg. 7

4.      *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 150, 120 S. Ct. 2097, 2110
        (2000).  – pg. 8

5.      *Glebocki v. City of Chicago*, 1999 U.S. Dist. LEXIS 13181 (N.D.Ill. 1999) – pg. 8

6.      *Kaimowitz v. Board of Trustees of Univ. of Illinois*, 951 F. 2d 765,767 (7th Cir. 1991). –
        pg. 8

7.      *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) – pg. 9

8.      *Simpson v. Borg-Warner Automotive, Inc.*, 196 F.2d 873,876 (7th Cir. 1999). – pg. 9

9.      *Lewis v. City of Chicago*, 496 F.3d 645; 2007 U.S. App. LEXIS 17811 (7th Cir. 2007). –
        pg. 10, 14.

10.     *Zayadeen v. Abbot Molecular, Inc.*, 2013 U.S. Dist. LEXIS 12135 (N.D. Ill. 2013).

11.  *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011). – pg. 11

12.  *Russell v. Bd. of Trs. of Univ. of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001). – pg. 12

13.  *Beck v. IL Dept of Children and Family Services*, 1997 U.S. Dist. LEXIS 7297 (N.D. Ill. 1997). – pg. 16

14.  *Thompson v. Memorial Hospital of Carbondale*, 625 F.2d 394, 407 (7th Cir. 2010). pg. 18

15.  *Overly v. Keybank Nat'l Association*, 662 F.2d 856, 862 (7th Cir. 2011) – pg. 22

16.  *Scruggs v. Garst Seed Co.*, 587 F.2d 832 (7th Cir. 2009).  – pg. 22

17.  *Deitz v. R.R. Donnelley & Sons*, 1996 U.S. Dist. LEXIS 2817 (N.D. Ill. 1996). – pg. 23

18.  *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 126 L. Ed. 2d 295, 114 S. Ct. 367, 370 (1993). - pg. 24

19.  *Grube v. Lau Indus., Inc.*, 257 F.3d 723,728 (7th Cir. 2001). – pg. 26

20.  *Thomas v. Maurice Sporting Goods, Inc.*, 686 F.Supp. 208, 213; 1988 U.S. Dist. LEXIS 9192 (N.D. Ill. 1988). – pg. 26

21.  *Bernstein v. Consolidated Foods Corp.*, 622 F. Supp. 1096, 1101 (N.D. Ill. 1984)  pg.26

## FACTS

### Background

Plaintiff adopts and restates paragraphs 1 – 12 of defendant's Statement of Uncontroverted Material Facts ("DSOF") as though fully set forth herein.

**A.  Plaintiff's Name**

Plaintiff asks the court to consider PSOF ##27 – 31.

**B.  Plaintiff's Performance Reviews, Wage Increases and Recognitions Under Nichols Compared to Performance Reviews and Performance Deficiency Notice Given by Terrien.**

  **i.  2008  and 2009 year-end reviews by Nichols.**

While plaintiff, in her 2008 year-end performance review, was rated "T" as "too new" to evaluate by her then supervisor Brent Nichols, Nichols nonetheless included assessments of plaintiff's work performance to date in that review and a highly favorable overall assessment of plaintiff which was approved by Nichols' boss, Mike Edwards, who was also Terrien's boss. PSOF #1 - 10; Nichols depo at 26-27; Dep. Ex. 33.

Plaintiff's overall rating in her year-end 2009 performance review was an "S" for "Solid Contributor", the middle of five possible ratings (DSOF #13 and Depo Ex. 11), however, Nichols rated plaintiff as "O" for "outstanding", the second highest rating, in three evaluation categories on her 2009 year-end performance review (PSOF ##12, 13, 15) and the categories for which plaintiff received that rating are particularly meaningful when one considers the critiques of plaintiff thereafter by Dan Terrien in her 2010 mid-year performance review and in the Performance Deficiency Notice given to plaintiff in December, 2010.

### iii. Plaintiff's Wage Increases and Recognition Under Nichols.

Nichols approved plaintiff for two raises, both of which were merit increases that could have been withheld by Nichols if not earned, and a "Discretionary Bonus" award of $1,300.00, 3% of her then annual wage, on or about Feb. 19, 2010. PSOF ## 18 – 19. On February 18, 2010, plaintiff was one of three employees in the D&I department that received a commendation from Gary Hirschel, Vice President of Global Supply Chain at LifeFitness, commending her and two others for performance that was "off the charts", for their being mentioned by name in sales presentations for the great job they were doing, for their hard work and for how much attention to detail and customer focus each of the three had. PSOF #24. Neither Nichols nor Edwards felt the commendation to plaintiff was unwarranted. PSOF ## 25 -26.

### iv. 2010 mid-year review by Terrien.

4

While plaintiff's mid-year 2010 performance review by Dan Terrien (Dep Ex. 16), given by Dan Terrien only four months after he became plaintiff's manager, did not contain letter ratings of plaintiff's work performance, it contained a number of criticisms of plaintiff's work performance which plaintiff contends were untrue (PSOF ## 106-110; Swidnicki depo 213 – 218, 287);  and which plaintiff further contends were in retaliation for her refusal to falsify missing equipment reports on one of the third party logistics ("3PL") companies she regularly worked with called Mass Movement (PSOF #111; Swidnicki depo at 218). Support for plaintiff's assertion of the lack of truth in Terrien's criticisms is found in the fact that certain of Terrien's criticisms directly contradict parts of plaintiff's year-end 2009 performance review by Brent Nichols given only 5 or 6 months prior thereto and by Nichols deposition testimony. For example, contrast Terrien's criticism that plaintiff "…has struggled to meet and commit to deadlines…The Weekly 3PL schedule is sent out consistently late and is usually sent out after 5PM on Fridays" (Dep. Ex. 16, pg. D227) with Nichols testimony that there was no delivery schedule that he knew of in the D&I department and it was not part of plaintiff's responsibility to get any such schedule to that sales department every Friday. PSOF ##22-23.  Further contrast Terrien's same criticism with Nichols observation just five months prior that he felt confident when plaintiff was tasked with assignments she get them done in a timely fashion.  PSOF #10. And a comparison of Terrien's additional criticisms of plaintiff with, for example: Mr. Nichols' comments summarized in PSOF ##12 – 15 can reasonably lead an objective observer to ask whether they are talking about the same person.

### v.  Performance Deficiency Notice ("PDN") issued to plaintiff by Terrien.

Plaintiff was placed on a Performance Deficiency Notice "(PDN") by Terrien on December 9, 2010 with the participation of Carol Stame, HR Director of several departments of

defendant including "supply chain" of which the Delivery and Installation Department ("D&I")

in which plaintiff worked was a part. PSOF ##32, 112, 119; Dep. Ex. 17.   Plaintiff asserts that

Terrien lied repeatedly about the alleged reasons for her placement on the PDN, in the meeting

and in the PDN itself.   Swidnicki depo at 223.   Although plaintiff admitting to having

performance deficiencies at that time, she asserts that none of Terrien's stated reasons for putting

her on the PDN were true.  PSOF #123; Swidnicki depo at 223 -225.

        As an example of the misrepresentations contained in the PDN, the court should

consider the statement by Terrien that plaintiff was "not approving invoices sent by Service for

Alaska, Hawaii or Canada." Dep. Ex. 17, pg. D14.   Plaintiff challenged that statement as being

untrue because, as an Installation Analyst, Brunswick policy was that she required her

supervisor's written authorization to approve invoices and Terrien had never given her that

authorization although she had requested it from several times.  PSOF #119.  See also the copy

of the blank authorization form sent to plaintiff by Sue Rackozy which was signed by plaintiff

and sent to but not signed by Terrien and the email trail between Sue Rackozy, plaintiff and

Terrien from 12/16 to 12/17/2010 with respect to same.  Dep. Ex. 49. Sue Rackozy was the

LifeFitness person who worked with the documentation and processes of these sorts of things

and who informed plaintiff of the need for her to have written authorization from her manager

before she could approve invoices.  PSOF #120; Swidnicki depo at 261.

        Further proof of the falsity of Terrien's statement in this regard can be found in the fact

that Plaintiff only worked in the "old" or "traditional" model with the 3PL's she worked with and

work in that model never included approval of invoices.  PSOF #121; Kobler depo at 26,

Hernandez depo at 49. According to Stephanie Junge, a delivery scheduler in the D&I

department that worked with plaintiff, Terrien kept all approval of such invoices to himself. PSOF #122; Junge depo at 51.

Plaintiff requests the Court to also consider: (1) her challenges to the truthfulness of several other criticisms Terrien leveled against her in the PDN as stated in PSOF ##123 – 130; (2) the fact that Stame's testimony is that she could not say it was not unusual for someone to put on a PDN only 9 months after receiving her year-end 2009 PMP rating her a "Solid" contributor with no evaluation in that PMP being at less than a solid rating and with three evaluations therein being at the Outstanding rating. PSOF #115; Stame depo at 70; (3) Stame's testimony that plaintiff's reaction at the time she was presented with the PDN was that she didn't agree with most of what was contained in it. PSOF #118.

Plaintiff's contention is that Terrien "knowing and falsely" put her on the PDN because of everything she has described – because of her Polish ethnicity and the things Terrien said about it, because she's a woman, because of the overtime complaint she made and because she refused to enter false information about the 3PL Mass Movement. PSOF #131; Swidnicki depo at 228-229, 296. More discussion of this follows in this memorandum.

## ARGUMENT

### I. Standard of review

When ruling on a motion for summary judgment the court must resolve all factual disputes and draw all reasonable inferences in favor of the party opposing the motion. *Holland v. Jefferson National Life Insurance Co.*, 883 F.2d 1307 (7th Cir. 1989); *Tolentino v. Friedman*, 46 F.3d 645, 649 (7th Cir. 1995), *cert. denied*, 115 S. Ct. 2613 (1995). Summary judgment is then appropriate only if the evidentiary materials before the court demonstrate there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

*Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Id.* at 1038. In reviewing the evidence this court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 150, 120 S. Ct. 2097, 2110 (2000). In *Reeves* the Supreme Court emphasized that on summary judgment the court must review the record in its entirety and give credence to evidence favoring the non-moving party. However, the court should only give weight to evidence supplied by the moving party if such evidence is *uncontradicted* and comes from *disinterested* parties:

> [T]he court should give credence to the evidence favoring the non-movement as well as that evidence supporting the moving party that is uncontradicted and un-impeached, at least to the extent that the evidence comes from disinterested witnesses. *Reeves,* 120 S. Ct. 2097, 2110 (2000)(internal citations and quotations omitted).

**II. Plaintiff has sufficiently exhausted administrative remedies to allow her related state law claims to stand.**

Plaintiff timely filed and pursued her Charge of Discrimination with the EEOC leading to her securing of a right to sue letter appended as Exhibit B to the Complaint filed herein. Contrary to defendant's sole argument that plaintiff failed to exhaust state remedies with respect to related state law claims, due to the workshare agreement between the EEOC and the IDHR, the filing of plaintiff's charge with the EEOC alone satisfies the burden of exhausting administrative remedies prior to filing suit with this court. See *Glebocki v. City of Chicago*, 1999 U.S. Dist. LEXIS 13181 (N.D.Ill. 1999), citing *Kaimowitz v. Board of Trustees of Univ. of Illinois*, 951 F. 2d 765,767 (7th Cir. 1991). Summary judgment should therefore be denied with respect to plaintiff's state law claims.

**III. Plaintiff has made a sufficient initial showing to sustain her federal and state law claims of discrimination, retaliation and sexual harassment.**

By its brief in support of its motion for summary judgment, specifically pages 3 and 4, defendant concedes that plaintiff has alleged and/or shown sufficient facts to withstand the first two elements[1] under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) and S*impson v. Borg-Warner Automotive, Inc.*, 196 F.2d 873,876 (7th Cir. 1999) and restricts it's argument to the remaining two elements contending that plaintiff has not sufficiently shown she suffered an adverse employment action or that similarly situated persons not in the protected class were treated more favorably. Contrary to defendant's argument, plaintiff has made a sufficient showing of both to support a denial of summary judgment on this basis.

### A.     Plaintiff's Claims of National Origin (Ethnic) Discrimination

Plaintiff asks that the court consider the blatantly derogatory comments about plaintiff's national origin frequently made to her by Dan Terrien, her direct supervisor, per the related facts set forth above and in paragraphs 19 and 21 of defendant's Statement of Uncontroverted Material Facts as though fully set forth herein. Contrary to defendant's labeling of Mr. Terrien's frequent remarks to plaintiff that third party vendors might not understand her due to her accent as being given "jokingly" (DSOF #20), plaintiff testified in her deposition that all of Mr. Terrien's comments about her ethnicity and accent were directed at plaintiff in a derogatory and condescending way, not in a joking manner (PSOF #142; Swidnicki depo at 280). As is frequently one of the most adverse things a person suffering discrimination feels, plaintiff in this case stated that the comments and the singling out of plaintiff by the posting of her Polish name by Mr. Terrien on the whiteboard in plain view of all in the delivery and installation department were all to make her look and feel "different" from her co-workers (PSOF #147; Swidnicki depo at 123-124 and 282). Plaintiff's upset at Terrien's inappropriate ethnic comments was visible to a

---

[1] Those elements being (1) she was a member of a protected class and (2) she was qualified for the job in question .

fellow employee who observed her to get red eyes when it would happen. PSOF #145; Kobler depo at 46. No other worker in the department suffered the making of similar derogatory comments and displays with regard to their ethnicity. No other worker in the D&I department had their ethnic name posted on the white board. PSOF #148; Junge depo at 56. Furthermore, lest defendant try to label certain of such comments as mere observations with respect to plaintiff's accent, plaintiff's co-workers uniformly stated that they had no problem understanding plaintiff in the workplace, accent or not. PSOF #140; Kobler depo at 41, Junge depo at 52, Hernandez depo at 51.

In *Lewis v. City of Chicago*, 496 F.3d 645; 2007 U.S. App. LEXIS 17811 (7th Cir. 2007), the Seventh Circuit stated, relevant part:

> Evidence used in the direct method is "not limited to near-admissions by the employer that its decisions were based on a proscribed criterion . . ., *but also includes circumstantial evidence which suggests discrimination albeit through a longer chain of inferences*." Luks v. Baxter Healthcare Corp., 467 F.3d 1049, 1052 (7th Cir. 2006) (citing Sylvester v. SOS Children's Villages Illinois, Inc., 453 F.3d 900, 902-03 (7th Cir. 2006); Ptasznik v. St. Joseph Hosp., 464 F.3d 691, 695 (7th Cir. 2006)). In the present case, [Plaintiff] Lewis provides both direct evidence and circumstantial evidence against the defendants sufficient to survive summary judgment under the direct method (*emphasis added*).

In the instant case, plaintiff submits she has shown more than enough direct and circumstantial evidence to warrant denial of defendant's motion with respect to her claims of national origin discrimination. The facts presented in this case to date are comparable to those in *Zayadeen v. Abbot Molecular, Inc.*, 2013 U.S. Dist. LEXIS 12135 (N.D. Ill. 2013) in which the complainant alleged ethnic discrimination because of derogatory comments about his national origin made by co-workers[2]. The court therein found:

---

[2] It should be noted that the case found such discriminatory remarks to be actionable although made by coworkers as opposed to the instant case in which they are alleged to be made by plaintiff's supervisor, a member of Brunswick management.

10

> National origin discrimination under Title VII is defined broadly "to include the denial of employment opportunities because of an individual's, or his or her ancestor's, place of origin or *because an individual has the physical, cultural, or linguistic characteristics of a national origin group.*" (*emphasis added*) *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 923 (7th Cir. 2007) (citing 29 C.F.R. § 1606.1); *see Al Herwi v. Jones Lang LaSalle*, 2011 U.S. Dist. LEXIS 92971, 2011 WL 3664443, at *2 (N.D. Ill. Aug. 19, 2011); *McIntosh v. Ill. Dep't of Employment Sec.*, 2007 U.S. Dist. LEXIS 48067, 2007 WL 1958577, at *5 (N.D. Ill. July 2, 2007). The alleged harassment in this case comfortably fits within that definition. *Id* at *21-22.

This court, then, should apply the requirement for a prima facie case of ethnic discrimination based on national origin harassment which is evidence sufficient for a reasonable jury to find that: (1) plaintiff's work environment was both objectively and subjectively offensive; (2) that the harassment was based on her race [or national origin]; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability. *Zayadeen, supra*, at *21, citing *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011).While defendant's motion and brief in support do not argue that plaintiff has failed to meet these requirements, in light of footnote 3 of defendant's brief in support, Plaintiff submits that the facts developed thus far in this case and all reasonable inferences to be drawn therefrom in plaintiff's favor support the denial of defendant's motion for summary judgment with respect to plaintiff's claim of ethnic discrimination.

As to the first and second elements required under *Vance, supra*, the facts show that the derogatory remarks about plaintiff's Polish ethnicity and accent by her supervisor, Dan Terrien, were made frequently and in a derogatory and condescending way, not in a joking manner. Plaintiff testified to her being subjectively upset at Mr. Terrien's comments and Plaintiff submits that such comments, by their nature, content and frequency, would be objectively found to be offensive under any reasonable standard of objective analysis.

As to the third element, it should be noted that plaintiff's claim in this regard is in the disjunctive – the conduct must be either severe *or* pervasive. *Vance*, 646 F.3d at 469. A court addressing this element must "look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Russell v. Bd. of Trs. of Univ. of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001). Plaintiff submits that, in her case just as in the case of *Zayadeen v. Abbot Molecular, Inc., supra,* the frequency and derogatory content of Mr. Terrien's comments about plaintiff's ethnicity and accent could be found by a jury to be pervasive in that her being so ridiculed, in the presence of co-workers, altered the conditions of her employment in a negative way.

As to the fourth element, it is uncontradicted that Dan Terrien was plaintiff's supervisor and a member of defendant's management with the ability to hire and fire and a basis for employer liability in the circumstances is therefore established. Employers are "strictly liable" for harassment inflicted by supervisors. *Zayadeen, supra* at *31.

**B.  Plaintiff's claims of retaliation.**

While the court can take judicial notice of the prohibition of 29 U.S.C. Sec. 215(a)(3), Defendant does not dispute that plaintiff herein was engaged in protected activity when she reported to Stame about Terrien's frequent directions to her not to record overtime hours she worked (PSOF #81) and his badgering of her in a number of respects not to record such hours, including, for example, his statements to her that she shouldn't do so in order to be a "team player." (PSOF #78) which forced plaintiff not to record many of the overtime hours she worked for fear of incurring Terrien's wrath. This also needs to be consider in the context of plaintiff's work situation in this regard – if she did not stay and put in the overtime to complete her work,

Terrien would criticize her for not getting it done but if she did stay and put in the overtime to complete her work, Terrien would badger her for recording her overtime or simply tell her not to do so. PSOF #77-78.  Others in the D&I department occasionally worked overtime as well to complete their tasks without being told not to do so and without being badgered about doing so. While Kobler, another female worker in the department, has said she too felt bullied by Terrien not to record overtime hours she worked (PSOF #84), he never told her not to record overtime she put in. Kobler reported her situation to Lori Panzarella in defendant's HR department and was backpaid for the overtime she hadn't initially reported and her direction to Panzarella not to mention to Terrien that she (Kobler) had gone to her about the problem for fear of Terrien retaliating against her is illuminating given plaintiff complaint in this case.  PSOF ##85-86. Defendant only challenges whether plaintiff has shown any adverse action that can be regarded as retaliatory and plaintiff submits that she suffered such action due to a combination of factors.

First, some additional facts as to plaintiff's attempt to seek redress for Terrien's actions in this regard. Plaintiff reported Terrien's unlawful actions to Stame in either August or in the "fall" of 2010.  Consider Stame's lack of training and the non-existence of FLSA investigations or discipline regarding some 900 – 1000 employees since 2002 (PSOF ##36, 39, 41). Stame told plaintiff she would take the matter up with Terrien (PSOF #90), didn't ask plaintiff to submit documentation of overtime she worked but did not report and she admitted not taking any action to have plaintiff paid for any additional overtime.  PSOF #99.  While Stame couldn't state with certainty if she told Terrien his actions were illegal, she said it was possible that she did so. PSOF #91.  Terrien, on the other hand, could not recall Stame ever mentioning anything to him about plaintiff's report to her of  Terrien's telling her not to record overtime hours or pressuring her not to record overtime hours (PSOF #92) and said that he did not know if telling someone not

to record overtime hours they worked was a violation of the [FLSA] law but stated that he did know that it wasn't the right thing to do. PSOF #97. Terrien's boss, on the other hand, Michael Edwards, stated that he and Terrien met with Stame sometime in the fall of 2010 and that Stame told them that if someone recorded overtime hours they had to pay them for that overtime; however, he did not recall Stame saying anything about telling people not to record overtime or criticizing them about working overtime being illegal. The deposition testimony in this regard clearly reflects the plaintiff's credibility in saying Stame didn't do anything about her FLSA complaint. PSOF #95.

### i.      Retaliation through increased badgering of plaintiff by Terrien.

After plaintiff reported her overtime problems with Terrien to Stame, her life "became a living hell in the department." Bringing the complaint to Stame's attention only made matters worse. PSOF #95. Terrien's pressuring plaintiff not to record overtime hours she worked became more frequent towards the end of 2010 when he would be on her about it all of the time. PSOF #82. Plaintiff thus suffered what could both subjectively and objectively be regarded as an adverse action through a detrimental change in her working conditions and a genuine issue of material fact exists in this regard that warrants denial of defendant's motion for summary judgment.

### ii.     Retaliation through denial of work opportunity.

Plaintiff asks the court to consider PSOF ## 71 – 73. When plaintiff asked Terrien when she would be permitted to start working in the new LFI model, Terrien would repeatedly tell her "soon". Once when she asked him about it again, he said "Yeah, that will happen" then he said "Who told you you were going on the new model?" PSOF #74.

In *Lewis v. City of Chicago*, *supra*, the Seventh Circuit reversed the district court's granting of summary judgment to the defendant in a Title VII case on the basis that the plaintiff therein had shown genuine issues of material fact with respect to adverse actions she claimed to have suffered, including but not limited to a claim that the plaintiff, a police officer, was denied an opportunity to participate in a detail assigned to security for an IMF meeting in Washington, D.C.  The 7th Circuit stated:

> We have noted that materially adverse employment action can be categorized into three groups of cases involving: (1) the employee's current wealth such as compensation, fringe benefits, and financial terms of employment including termination; (2) *the employee's career prospects thus impacting the employee's future wealth;* and (3) changes to the employee's work conditions including subjecting her to "humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in [her] work place environment." <u>*Hermreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002)</u> (internal citations and quotations omitted)(*emphasis in cite added).*

> *Id* at 653.

The court went on to state:

> [Plaintiff] Lewis can construct from the evidence an argument that by denying her the opportunity  to participate in the IMF Detail, she lost her ability to move forward in the component of her career of being a police officer at recurring large scale public gatherings.

> *Id* at 654.

In this regard, Plaintiff has clearly shown sufficient facts and inferences reasonably drawn therefrom that she suffered what could both subjectively and objectively be regarded as an adverse action through a denial of work opportunity not suffered by any other employee in the D&I department and a genuine issue of material fact exists in this regard that warrants denial of defendant's motion for summary judgment.  The LFI model was clearly the up and coming thing at Brunswick for workers in the D&I department to work with and the denial of opportunity to

work in that system by Terrien can arguably be shown as being materially adverse to plaintiff's career prospects.

### iii. Retaliation through false statements in and placing plaintiff on the PDN.

Plaintiff alleges numerous facts, above, and in her Statement of Additional Facts, to objectively support her assertion that many of the alleged "reasons" Terrien placed in her PDN were just plain false (PSOF ##108, 109, 119 -122, 128 – 130) . Such misrepresentations provide proof in and of themselves of Terrien's ulterior motive of retaliation against plaintiff for her refusal to enter false information into the tracking system about missing equipment at Mass Movement  (PSOF ##47, 55 – 57); her being of Polish descent (see argument and facts with respect to plaintiff national origin discrimination claim above); her being female (in a department headed by Terrien who considered a woman to be half a man (PSOF #58), who was closer to and "buddy-buddy" with the male employees in the department (PSOF #62 – 63); (4)  her seeking a new position in another department of defendant (for which Terrien, after finding out she had done so, called her into his office and yelled at her about it in a raised voice (PSOF #105); and, last but certainly not least, her reporting him for FLSA violations.

### a. Pretext Shown by Terrien's false statements in PDN.

In particular though, the placing of plaintiff on the PDN by Terrien under what plaintiff asserts are false pretenses becomes even more circumstantially visible as being retaliatory for reporting him for the FLSA violation just by reading his statements in the PDN and considering the objective proof of their falsity as set forth in PSOF listed in the first paragraph of this argument.

In *Beck v. IL Dept of Children and Family Services*, 1997 U.S. Dist. LEXIS 7297 (N.D. Ill. 1997), the court provided a summary of what is involved in a plaintiff's showing of pretext as follows:

> Pretext is more than a mistake; it means "a lie, specifically a phony reason for some action." *Wolf v. Buss (America), Inc.,* 77 F.3d 914, 919 (7th Cir. 1996); *Mills v. First Fed. Sav. & Loan Ass'n,* 83 F.3d 833, 845 (7th Cir. 1996). To establish pretext, a plaintiff must "specifically refute the facts which allegedly support the employer's proffered reasons." *Mills,* 83 F.3d at 845 (quotation omitted). A plaintiff may do so directly by presenting evidence that the employer was more likely than not motivated by a discriminatory reason, or indirectly by presenting evidence that challenges the credibility of the employer's explanation. *Id.; Collier v. Budd Co.,* 66 F.3d 886, 892 (7th Cir. 1995); *Robinson v. PPG Indus.,* 23 F.3d 1159, 1163 (7th Cir. 1994). To challenge the credibility of the proffered explanation under the indirect method, a plaintiff must demonstrate (1) *the proffered reasons are factually baseless (emphasis added)*; (2) the proffered reasons were not the actual motivation for the adverse employment action; or (3) the proffered reasons were insufficient to motivate that adverse employment action. *Wolf,* 77 F.3d at 919; *Collier,* 66 F.3d at 892. Ultimately, however, the inquiry into pretext is limited to "whether the employer gave an honest explanation of its behavior." *Kralman v. Illinois Dep't of Veterans' Affairs,* 23 F.3d 150, 156 (7th Cir. 1994). In determining whether the plaintiff has established pretext, the court may consider the sum or totality of the evidence presented. *Futrell v. J.I. Case,* 38 F.3d 342, 246 (7th Cir. 1994).

The court went on in *Beck, supra*, to state the general rule that a plaintiff alleging pretext must demonstrate that each reason given by the employer was pretextual, but then stated:

> "That rule, however, is subject to the following caveat: "there may be cases in which the multiple grounds offered by the defendant for an adverse action . . . are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment." (citing *Russell v. Acme-Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995). *Id.* at *15.

Plaintiff submits she had made the necessary prima facie showing that certain of Terrien's stated reasons for placing her on the PDN are factually baseless and that the character of Terrien's stated reasons are thus so "fishy and suspicious" in the circumstances to withstand summary judgment in this case.

### b.     PDN is an adverse action.

Defendant asserts in its Motion that placement on a PIP (typically regarded as an acronym for a "performance improvement plan") is not an adverse action and relies on that argument as its primary basis for seeking summary judgment this case with respect to plaintiff's national origin and gender discrimination claims and plaintiff's retaliation claims. Plaintiff submits that the reality of what placement on a PDN at Brunswick means shows that it is not the simple "PIP" defendant argues it is but is, instead, more closely akin to placement of its recipient on a form of probation with little or no hope of completing it successfully to retain his/her job.

Matt Melick was put on a PDN by defendant through Terrien as Melick's supervisor, then fired by Terrien. PSOF #132. Nichol Kobler was put on a PDN by defendant, then fired. PSOF #133. Plaintiff testified in her deposition that once you were put on a PDN at Brunswick you didn't have a chance of completing it successfully and being allowed to continue to work. PSOF #134. What happened to Mr. Melick and Ms. Kobler supports plaintiff's opinion in this regard.

Plaintiff submits that, in the circumstances of what being placed on a PDN means at Brunswick, placement on a PDN is more closely akin to a temporary delay leading inexorably to termination of employment or, at best, placement on what amounts to a probationary status or that the nature of what a PDN is presents at least a genuine issue of material fact that should warrant denial of summary judgment so as to allow a jury to decide that issue. As the Seventh Circuit said in *Thompson v. Memorial Hospital of Carbondale*, 625 F.2d 394, 407 (7th Cir. 2010): "…we have previously suggested that placing an employee on probation might constitute an adverse employment action (see *Smart v. Ball State University*, 89 F.2d 437, 442 (7th Cir. 1996))."

### iv. Retaliation through termination of plaintiff's employment.

Defendant certainly does not contest that termination of employment is an adverse action. Plaintiff never resigned from employment at Brunswick. Swidnicki depo at 268. Her employment was terminated through elimination of her position when she did not return from family medical leave and plaintiff believes Terrien would have been involved in that decision to eliminate her position. Swidnicki depo at 269.

**C. Plaintiff's claims of sexual harassment – hostile work environment.**

**i. Facts specifically regarding plaintiff's sexual harassment claim.**

Numerous specific facts regarding this issue have been submitted for the court's consideration. Sometime after plaintiff went to Stame with her complaint about Terrien's claimed FLSA violations, Terrien reconfigured the seating arrangement in the D&I department moving plaintiff to a cube next to Davila. DSOF #27. Plaintiff stated that Davila was Terrien's "first man" and the one who delivers information to Terrien about everybody (PSOF #60) and she contends that Terrien assigned Davila to gather information about her and report it to Terrien. DSOF # 28. This observation about Davila was not unique to plaintiff as: (i) Kobler also described him as being Terrien's "spy" and said that plaintiff was afraid of Davila for the same reason (PSOF #61); and (ii) Judy Gustafson of defendant's HR department told plaintiff, when plaintiff reported the new seating arrangement to her in August 2010, that she'd better be careful what she said which plaintiff felt was a warning not to complain or stir up trouble. PSOF ## 44 – 45.

Prior to the time of the Myers-Briggs exercises around August, 2010, Davila's sexual comments were made out in the open for everyone to hear and included his imitation of Michael Jackson which involved Davila grabbing his crotch while dancing. PSOF #153. While Davila's sexual comments bothered her from the start, plaintiff didn't want to be the only one saying

anything about it before August, 2010.  PSOF #155.  Beginning right after the Myers-Briggs exercises, Davila started saying the most disgusting sexual comments directly to plaintiff who was seated right next to him and, from that time, the sexual comments multiplied from week to week, **eventually to the point that he was making the comments 20 to 30 times a day**.  PSOF #154.

Plaintiff identified some of the many sexually inappropriate comments Davila made in Dep. Ex. 15 (PSOF #156) in addition to those admitted to by defendant in DSOF #29, including but not limited to: "Kathy, do you want to hold my balls",   "My pants are not comfortable and my schmeckel is itching", "There are ants in my pants", "My schmeckel is hot in my pants. I kissed the schmeckel right with my face", "Kathy, I love sausage in my mouth; better there than in my pants", "Kathy, there is a party in my pants",  "Kathy, my crotch is sweaty","My johnson likes to stay at the Johnson","Kathy, I wet my crotch","Do you want to feel my balls, Kathy?", "Kathy doesn't love Gunther's balls", "Kathy, do you want to taste my schmeckel?", "Kathy, do you like to swallow?" and "Kathy likes eating…wienerschnitzels is more pleasurable."

Plaintiff recorded many of Davila's remarks on post-it notes, some of which she saved after her last day of work at defendant and which are attached to Dep. Ex. 15 at pp. 151-160. PSOF #156.  (note: those pages with an "A" or "B" denote opposite sides of same post-it note). According to plaintiff, Dep. Ex. 15 is not an exhaustive list by any means of the many sexually inappropriate comments made by Davila – "there were a ton more."  PSOF #157.

Kobler and Junge both verified Davila's making of sexually explicit remarks.  PSOF #158.  Contrary to defendant's characterization of Davila as an "equal opportunity harasser", while Kobler testified that some of Davila's sexual comments were made in general, out loud in the department for everyone to hear (Kobler depo at 71) , many of them were directed at plaintiff

(Kobler depo at 71 – 76). Kobler said that Davila said these things to Kathy on a daily basis. Kobler depo at 76.

In addition, Davila would sit next to plaintiff and whisper "I love you, Kathy" and "Don't you love me back? Say it. Don't you love me back? Do you love me, Kathy? Don't you love me back?" and, on more than one occasion, he would pull out the waistband of his shorts in front of plaintiff and look at his private parts while making sexually explicit remarks like "My crotch is sweaty." PSOF #167 – 168.

Plaintiff and Kobler and other women in the office had to stop making their calls which were part of their work when Davila would make his out-loud, sexually explicit remarks and this affected their ability to get their work done. PSOF #165; Kobler depo at 81. Plaintiff would wait until Davila got on the phone to make her phone calls and work because she was afraid people on the other end of the phone would hear him. Dep. Ex. 15, pg. 149. Plaintiff said that sometimes the sexual comments Davila made were so bad, everyone in the department, including the men who usually laughed at his remarks, would go silent. PSOF #166. According to Kobler, plaintiff did not laugh at Davila's comments, was upset by them, and asked Davila to stop saying them and asked Terrien to make Davila stop saying them because plaintiff was more sensitive to the comments than the others in the department. PSOF #159. Plaintiff submits that she was so offended by Davila's inappropriate sexual remarks, she was crying, dabbing at her eyes and her voice was breaking when defense counsel was asking her questions about Davila's comments during her deposition. PSOF #164.

Plaintiff would frequently ask Davila to stop making the sexually explicit remarks to her but he wouldn't stop and instead he would say back to her "Oh Kathy, I love you – I know you don't mean it." PSOF #162. Kobler verified that plaintiff asked Davila to stop but Davila kept

on doing it.  PSOF #163.  Kobler and another worker in the department, Stephanie Junge, both stated that Davila made such remarks in front of Terrien but Terrien never told him to stop. PSOF #160.  According to Kobler, Terrien would laugh at Davila's comments or would join in with what Davila was saying.  PSOF #161.  In addition, Plaintiff reported Davila's comments to Terrien on at least two occasions. PSOF #169.  Terrien told plaintiff Davila was "just letting off steam" because he was "under pressure."  DSOF #33.  Plaintiff told Kobler at lunch once that she had reported Davila to Terrien but Terrien didn't say anything to Davila to stop.  Kobler depo at 81.  If plaintiff brought Davila's sexual harassment of her to Terrien, it would have been Terrien's responsibility to bring that to Stame's attention but Terrien never made any such report to Stame.  PSOF #170.  Plaintiff also went to Terrien's supervisor, Mike Edwards, to tell him about Davila's actions (and also about the overtime and discrimination issues with Terrien) , but after saying there's "some inappropriate things" going on, including "sexual innuendoes", Edward's cut her off and told her she needed to take such issues up with her manager.  DSOF ## 34 – 35. That meeting lasted "about a minute." Swidnicki depo at 174.  Plaintiff stated that she did not report Davila's harassment to Stame because she had gone to Stame about Terrien's illegal activities regarding the overtime and nothing had happened and Stame hadn't done anything about it; and that she went to her manager and her manager's manager and nothing happened; that no one did anything and she lost her trust in management.

It should be noted that there is nothing in Dep. Ex. 3, defendant's "Guide to Conduct in the Workplace" that requires a person claiming harassment to report it to more than one of the possible indicated persons to receive such reports.  PSOF #172.  Again, no sexual harassment investigation was ever conducted into Davila's actions and no discipline was ever meted out against Davila or Terrien.  PSOF ## 39 and 100.  To Stame's knowledge, neither Terrien nor

Davila were ever placed on a PDN.  PSOF #101.

### ii. Argument

In determining whether the sexist conditions of employment are severe or pervasive enough to create "an abusive working environment", the court should consider the severity of the alleged discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive and whether it reasonably interferes with an employee's work performance. *Overly v. Keybank Nat'l Association*, 662 F.2d 856, 862 (7th Cir. 2011), citing *Scruggs v. Garst Seed Co.*, 587 F.2d 832 (7th Cir. 2009).  Plaintiff asks the court, in this regard, to consider the conduct complained of in *Deitz v. R.R. Donnelley & Sons*, 1996 U.S. Dist. LEXIS 2817 (N.D. Ill. 1996) in which summary judgment was denied the employer which made arguments the same as or similar to those made in this case.

In *Dietz*, the plaintiff complained of alleged sexual harassment by her supervisor, one William Shirey, identifying the following conduct: (1) Shirey told jokes involving penises and intercourse in the confines of his office; (2) Shirey drew his initials with two dots in such a way as to suggest women's breasts; (3) Shirey repeatedly bragged about his sexual prowess in his younger years; (4) Shirey screamed "Watch Out!" when plaintiff bent over, implying that it was unsafe and intercourse from behind might result; (5) Shirey stared at women wearing tight clothing and short skirts especially focusing on their breasts; (6) Shirey stared down the top of an employee's blouse at her breasts while she was taking an aptitude test; (7) Shirey repeatedly made degrading comments about women in general, including remarking that the Elgin facility remained open because all housewives, such as plaintiff, who lived in the suburbs were cheap expendable labor, that certain female supervisors were promoted as a token gesture and that all women employees were lazy.  *Id* at *17 – 18.  The court applied the analysis set forth *Overly v.*

*KeyBank Nat'l Assn., supra,* although it cited *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 126 L. Ed. 2d 295, 114 S. Ct. 367, 370 (1993) as its source and stated: "These factors are evaluated from both a subjective and an objective viewpoint. The court considers not only the effect that the discriminatory conduct actually had on plaintiff, but also the impact that it likely would have on a reasonable employee in plaintiff's position. *Id. at 370.*"

The court in *Dietz* then analyzed whether the above-stated facts satisfied the "subjective" prong of the test[3], and noted:

> Defendant asserts that, although Shirey's conduct was "boorish, sophomoric, and in execrable taste", it does not rise to the level of a hostile environment. Defendant concedes that Shirey's conduct may have "offended" plaintiff, but implies that plaintiff could not have subjectively viewed her work environment to be hostile and abusive as a result.
>
> Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could conclude that she subjectively viewed the Donnelley environment as be hostile and abusive. *Plaintiff has been able to identify a barrage of offensive confrontations over a six-month period that could arguably be deemed sexual harassment. Although she was not subjected to any physical threats, she was forced to endure humiliating treatment that could reasonably be regarded as creating a discriminatory work environment.* (emphasis added)

> Id at \*9 – 10.

The court also considered the effect of the lewd conduct on plaintiff, emotional trauma and the need for her to seek and continue to receive psychiatric care, similar to the effect on plaintiff in the instant case as she has testified to (PSOF # 174 – 183), and found the plaintiff therein to have met the "subjective" prong of the analysis. *Id* at \*11.

The court then proceeded to the objective prong of the test and summarized the applicable legal analysis as follows:

> Indeed, it is plain that an offensive utterance would not, by itself, give rise to a Title VII claim because it would not sufficiently affect the terms and conditions of the

---

[3] Plaintiff provides this portion of the Dietz opinion for the sake of completeness although defendant does not, in the instant case, argue that Davila's conduct was not subjectively offensive to plaintiff.

plaintiff's employment. *Harris,* U.S. , 114 S. Ct. at 370; *see also Meritor,* 477 U.S. at 67. Yet a series of such statements, if sufficiently severe and pervasive, could give rise to an objectively hostile work environment under the *Meritor* standard. *See,* e.g., *Steiner,* 25 F.3d at 1463; *Nash v. Electrospace Sys., Inc.,* 9 F.3d 401, 403 (5th Cir. 1993); *Daniels,* 937 F.2d at 1270 (pervasive pattern of racial jokes sufficient to sustain a hostile environment claim.) *Id* at *12.

Applying that analysis to the above-stated facts, the *Dietz* court found:

> Plaintiff argues, and the court agrees, that Shirey's series of sexually explicit jokes, comments, staring, and abusive use of plaintiff's time establishes a genuine issue of material fact as to whether a reasonable person would have considered his conduct to create a hostile work environment. *Id* at *12 – 13.

Plaintiff in the instant case suffered a similar barrage of patently offensive sexual remarks made to her by Davila. The frequency of the making of these remarks, eventually reaching 20 to 30 times per day (PSOF #154), is not disputed by defendant. The sexually suggestive and demeaning nature of Davila's comments in the instant case are certainly more severe than the comments made in *Deitz, supra*. Can anyone reasonably claim that Davila's disgusting sexual comments, only some of which are listed in Dep. Ex. 15 and some of them said while staring down his open waistband at his private parts and said some 20 – 30 times a day could not possibly be found by a jury to be objectionably humiliating and offensive as part of the test of hostile work environment?

And finally, looking at the final prong of the "hostile work environment" test (reasonable interference with work performance), plaintiff asks this court to recall the deposition testimony that Plaintiff and Kobler and other women in the office had to stop making their calls which were part of their work when Davila would make his out-loud, sexually explicit remarks and this affected their ability to get their work done; that Plaintiff would have to wait until Davila got on the phone to make her phone calls and work because she was afraid people on the other end of the phone would hear him; and that sometimes the sexual comments Davila made were so bad,

everyone in the department, including the men who usually laughed at his remarks, would go silent. Also, recall that plaintiff was badgered by Terrien about working overtime hours, overtime likely made necessary in order for plaintiff to get her work done due to the frequent disruptions caused by Davila's inappropriate sexual comments.

In sum, more than enough facts have been adduced to date to warrant denial of defendant's summary judgment motion with respect to plaintiff's sexual harassment claim.

### D. Constructive Discharge

Plaintiff does not dispute defendant's statement in its brief of the requirements for a constructive discharge claim given in *Grube v. Lau Indus., Inc*., 257 F.3d 723,728 (7th Cir. 2001). Plaintiff does dispute, however, defendant's argument that plaintiff has failed to make a prima facie case of an alternative basis of constructive discharge given the conditions plaintiff had to work under as fostered by Terrien and Davila, the indifference of Terrien's boss, Edwards, to plaintiff's plight when she sought to bring it to his attention, and the failure of defendant to even investigate any of plaintiff's claims.

Whether an employee was constructively discharged is a question not well-suited to disposition by summary judgment. *Thomas v. Maurice Sporting Goods, Inc.*, 686 F.Supp. 208, 213; 1988 U.S. Dist. LEXIS 9192 (N.D. Ill. 1988). As support for its statement in this regard, the Court in *Thames* cited *Bernstein v. Consolidated Foods Corp*., 622 F. Supp. 1096, 1101 (N.D. Ill. 1984) and noted:

> Application of this "reasonable person" test involves complex questions of fact, including, inter alia, the nature of the working conditions, their difficulty or unpleasantness, and what a reasonable person would or would not do under such conditions. Thus, the issue of whether there has been a constructive discharge normally should be left to the trier of fact. *Id*.

Plaintiff has shown more than enough facts as to raise numerous issues of material fact as to what she was subjected to working in the D&I department of defendant following Terrien's takeover as her boss and to enable a jury to reasonably conclude she was constructively discharged when she didn't report back to work after December 28, 2010. They show how plaintiff, from the date of her first one-on-one meeting with Terrien, was thereafter subjected to derogatory and demeaning comments about her national origin and the deliberate change of the English version of her name she had always gone by to the Polish version on the office whiteboard for everyone in the department to see; things that no one else working for Terrien suffered, all which plaintiff regarded as an attempt by Terrien to single her out, make her feel different, upset and provoke her.

They further show some of the other day-to-day difficulties plaintiff faced trying to do her job under Terrien's direction, a job she was recognized and rated for doing extremely well by her former supervisor; including the inconsistency in Terrien's direction, his yelling of profanities, his direction to plaintiff to enter untrue information about a 3PL he had it in for, numerous instances of plaintiff requesting assistance from Terrien he did not respond to, his sneaking behind and hovering over her to intimidate her, all of which led to plaintiff being observed crying by a co-worker and to plaintiff and Kobler both being afraid of Terrien. Add to this Terrien's remarks about the regard in which he held women (only equal to half a man) and his obvious greater closeness to the two male employees in the department (Davila and Brian Clapper), all of which raise issues as to whether plaintiff was ever treated fairly by her boss.

They further show the blatant violation of the FLSA by Terrien in his badgering of and direction to plaintiff not to record overtime hours she worked which only became worse AFTER plaintiff reported him to Stame who took no action to follow up with plaintiff to see she was paid

for overtime hours she would have reported but for Terrien's pressure on her to do otherwise and didn't investigate Terrien's activities or discipline him in any way for those activities.

They further show the frequent, humiliating and disruptive sexual harassment of plaintiff by Davila, enabled in no small part by Terrien's retaliatory placement of Davila next to plaintiff in the seating reconfiguration and by Terrien's laughter at and participation in the blatantly sexual actions and comments of Davila.

They further show actionable retaliation against plaintiff by (i) Terrien's increased badgering of plaintiff not to record overtime she worked after Terrien learned of plantiff's reporting of it to Stame; (ii) the denial by Terrien, unique to plaintiff, of any opportunity to learn and transition over to the newest equipment tracking model; (iii) Terrien's making of material misrepresentations as alleged reasons in and for the PDN plaintiff was placed on which have objectively been shown to be false; and (iv) the very placement of plaintiff on a PDN which, in practice at Brunswick, is not an entreaty to improve the recipient's performance as much as it is a relegation to probationary status or a procedural stepping stone to termination.

And finally, they further show the physical and mental conditions plaintiff suffered as a result of all the above attributes of what plaintiff submits was a patently unbearable day-to-day work environment that, under any subjective AND objective analysis, would have rendered any reasonable person unable to return to such a work environment. Defendant's motion fails in this respect as well.

## Conclusion

Plaintiff has submitted substantial evidence to support each and every federal and state law count in her Complaint. While defendant may dispute the facts presented, plaintiff's evidence clearly shows that such factual disputes can only be resolved by a jury. If the court

draws any and all inferences from the evidence adduced in plaintiff's favor, as this court is required to find in deciding defendant's motion for summary judgment, defendant's motion must be denied.

WHEREFORE, plaintiff Katherine Swidnicki respectfully requests that defendant's motion for summary be denied in all respects.

Respectfully submitted,

/s/ Steven C. Kyriazes
Steven C. Kyriazes

Attorney for Plaintiff

Steven C. Kyriazes, P.C.

ARDC No. 1555464

121 S. Wilke Rd., Ste. 301
Arlington Heights, IL 60005
(847) 788-1500
E-mail: sck@sckpc-law.com

## Certificate of Service

I hereby certify that a copy of the above and foregoing was electronically filed with the Court this 19th day of August, 2013, and also on the following:

David C. Vogel
Lathrop & Gage LLP
2345 Grand Blvd., Ste. 2800
Kansas City, MO 64108
E-mail: dvogel@lathropgage.com

Counsel for Defendant

/s/ Steven C. Kyriazes
Steven C. Kyriazes

Attorney for Plaintiff