**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

KATHERINE SWIDNICKI,

                    **Plaintiff,**

      **v.**

BRUNSWICK CORPORATION,

                    **Defendant.**

**Case No. 12 C 3987**

**Hon. Harry D. Leinenweber**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Katherine Swidnicki ("Swidnicki") brings this action against her former employer, Brunswick Corporation ("Brunswick"), alleging that she was discriminated against on the basis of her national origin and gender, sexually harassed, and retaliated against for reporting to a human resource manager that she had been instructed by a supervisor not to record overtime hours she had worked. Swidnicki seeks relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), and the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5 ("IHRA"). Brunswick has moved for summary judgment. (ECF No. 15). For the reasons stated herein, the Motion is granted in part and denied in part.

## I. BACKGROUND

The background facts are derived principally from the parties' Local Rule 56.1 submissions and are undisputed except where noted.

Swidnicki is a native of Poland and has resided in the United States since emigrating with her family in the 1980s. From 2008 until 2011, she worked as an Installation Analyst at Life Fitness, a group within Brunswick that sells exercise equipment. Her duties consisted primarily of arranging for third-party vendors to deliver and install exercise equipment at customers' locations.

Between 2008 and 2010, Swidnicki worked on a team supervised by Brent Nichols ("Nichols"). In 2009, Swidnicki received an evaluation from Nichols rating her overall performance as "satisfactory," the middle of five possible ratings. Nichols' evaluation offered positive comments and identified areas where he believed Swidnicki's performance could be improved. For example, Nichols stated that Swidnicki needed to work on her efficiency and response time to issues with third-party logistics. He further noted that she worked late almost every day even though her workload was "on the lower end," and that she would benefit from a "greater sense of urgency" and faster turnaround on her review of certain audits.

In March 2010, Swidnicki was transferred to a team with a different supervisor named Dan Terrien ("Terrien"). In one of their first meetings together, Terrien asked Swidnicki about her nationality. He expressed surprise that she was working in an area where "not a lot of Polish people" worked and stated that "a lot of Polish people are in cleaning services." Terrien later mentioned to Swidnicki that some vendors might have difficulty understanding

her due to her accent.  On one occasion, he asked Swidnicki if she needed a dictionary to "look up" what he was saying.  On another, he stated that her "European accent" was "getting in the way" and told her that she needed to practice her language skills.  Terrien continued to make similar comments to Swidnicki about once per month during the ten-month period he supervised her.

During a meeting in the fall of 2010, Terrien changed Swidnicki's first name on a dry-erase board from "Kathy" to "Katyrzyna," a misspelling of her birth name, "Katarzyna."  This disturbed Swidnicki because she always had used "Kathy" around the workplace and she viewed Terrien's changing of her name as an attempt to upset or provoke her.

Swidnicki disagreed with Terrien's management style and felt that he was not providing her with enough assistance and that he gave inconsistent direction.  She was bothered by the fact that he sometimes directed her to enter incorrect information into the company's tracking system and later would blame her for any problems that arose.  In addition, she felt slighted that she had not been permitted to work using the company's "new model" for tracking equipment deliveries.  Despite her requests to be transferred over to the new model, Terrien told her that he preferred her working in the "classic model" because she knew "all of the ins and outs" of that system.

On a more general level, Swidnicki felt intimidated by Terrien because he often raised his voice and used profanity around the

office.  He was less friendly with female employees and, on one occasion, referred to a female technician based on the west coast as being the equivalent of only "half a man."

In July 2010, Swidnicki received a mid-year evaluation in which Terrien stated that she had "done a great job reducing storage" at vendors' facilities, but noted that she struggled with meeting deadlines and that she needed to do a better job of cleaning up third-party inventory.  Terrien did not give Swidnicki any specific rating, but Swidnicki perceived the review as being negative and disagreed with Terrien's criticism.

Although Swidnicki often felt that she needed to work overtime in order to complete her work, Terrien told her that she should not be putting in additional hours and expressed concern that she was making "extra work" for herself.  When she did not stay and work overtime, however, Terrien would criticize her for failing to complete her work.  Terrien also told Swidnicki on several occasions not to report the overtime hours she worked.

In the fall of 2010, Swidnicki complained to Carol Stame ("Stame"), the Director of Human Resources, about Terrien's instructions to her regarding overtime.  Stame told Swidnicki that she should record her overtime hours as permitted by law and indicated that she would take up the matter with Terrien.  However, Swidnicki did not think Stame acted on her complaint and neither Terrien nor Stame recall ever discussing the issue.

Sometime later, Terrien altered the team's seating arrangement, moving Swidnicki next to a co-worker named Luis Davila ("Davila"). Davila routinely engaged in inappropriate behavior, often making off-color sexual remarks to Swidnicki. A sampling of his conduct includes: performing a Michael Jackson imitation during which he grabbed his crotch; making repeated references to his "schmeckel," the Yiddish term for a small penis (he would say, for example, "My schmeckel is so much bigger than these carrots," "My schmeckel is itching," or "Kathy, do you want to taste my schmeckel?"); stating that there were "ants in [his] pants" or that there was a "party in [his] pants"; stating to Swidnicki that he had "wet [his] crotch"; asking Swidnicki whether she wanted to feel his "balls"; making suggestive remarks about having engaged in homosexual relations with co-workers; stating to Swidnicki that he had a long "shaft" and that he enjoyed eating "hairburgers," a vulgar reference to female genitalia; commenting that a hair he found may have been a pubic hair and asking Swidnicki if it was hers; suggesting to Swidnicki that she "give love" to a co-worker; asking Swidnicki if she liked to "swallow"; whispering comments to Swidnicki such as "I love you, Kathy. Don't you love me back? Say it. Don't you love me back?"; and pulling out his waistband to look at his genitals while in front of Swidnicki and commenting "my crotch is sweaty."

Over time, Davila's conduct grew incessant to the point where he was making sexually explicit comments between 20 and 30 times

per day.  Swidnicki and other employees often had to stop making work-related telephone calls because of Davila's loud remarks and there were times when his comments were so crude that the whole department, even those who usually laughed at his remarks, would go silent.

Despite Swidnicki's requests to stop, Davila persisted with his behavior.  When Swidnicki complained to Terrien about Davila's conduct, Terrien stated that Davila simply was "letting off steam" because he had been under pressure.  Swidnicki later brought her concerns to Terrien's supervisor, Mike Edwards ("Edwards"), but was told that she needed to take up the issue with Terrien.

In December 2010, Terrien and Stame issued Swidnicki a Performance Deficiency Notice ("PDN"), identifying a number of concerns about her work.  These included problems following the proper logistics processing procedures, failure to submit invoice approvals in a timely manner, poor time-management and inability to meet deadlines, failure to follow-up with Terrien about documenting time spent on various tasks, refusal to follow processes used by the rest of the team, failure to be a "team player," and insubordinate attitude.  The PDN also gave Swidnicki a time frame within which she needed to show improvement in these areas.

Near the end of the year, Swidnicki went on medical leave to have surgery on her hand.  Although she was scheduled to resume work on January 17, 2011, she did not return.  Swidnicki claims that, while on leave, she suffered an anxiety attack over the

thought of returning to work.  She secured a note from a family doctor excusing her from work and began seeing a psychologist. Despite failing to return to work, Swidnicki continued to receive her full salary and benefits for more than six months.  Thereafter, in July 2011, Swidnicki was terminated after having been informed by Brunswick that her benefits under the company's salary continuation policy had been exhausted.

## II.  LEGAL STANDARD

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it might affect the outcome of the suit.  *Id.*  If the moving party satisfies its burden, the non-movant must present evidence sufficient to demonstrate that a genuine factual dispute exists.  *See, Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  In doing so, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." *Sarver v. Experian Info. Sys.,* 390 F.3d 969, 970 (7th Cir. 2004).  Rather, it must demonstrate "through specific evidence that a triable issue of fact remains on issues for which the nonmovant bears the burden of proof at trial." *Knight v. Wiseman,* 590 F.3d 458, 463-64 (7th Cir. 2009).

### III.  ANALYSIS

#### A.  State Law Claims

At the outset, Brunswick argues that Swidnicki's discrimination and harassment claims under the IHRA are barred from review because she failed to exhaust her administrative remedies with the Illinois Human Rights Commission ("Commission") prior to bringing this suit.  The IHRA vests the Commission with exclusive authority to hear complaints seeking redress for alleged violations under the Act.  *Jimenez v. Thompson Steel Co., Inc.,* 264 F.Supp.2d 693, 695 (N.D. Ill. 2003) (citing *Mein v. Masonite Corp.,* 485 N.E.2d 312, 315 (Ill. 1985)).  Judicial review of such claims is available only after the Commission has issued a final order on a complaint.  *Flaherty v. Gas Research Institute,* 31 F.3d 451, 458 (7th Cir. 1994).

Swidnicki does not allege that she initiated any proceedings before the Commission or received a final order on her complaint.  Rather, she contends that her filing of a charge with the Equal Opportunity Employment Commission ("EEOC") and the EEOC's subsequent issuance of a Right to Sue Letter satisfied her obligation to exhaust her administrative remedies because of a workshare agreement that exists between the EEOC and the Commission.  Although Swidnicki is correct that the EEOC and the Commission have a workshare agreement, "a right to sue letter from the EEOC cannot be used as a substitute for a final order from the

Commission." *Davis v. Metro. Pier & Exposition Auth.,* No. 11 C 9018, 2012 WL 2576356, at *9 (N.D. Ill. July 3, 2012).

Because Swidnicki has not alleged that she received a final order from the Commission, the Court lacks jurisdiction over her state law claims. Accordingly, Counts VIII and IX of her Complaint are dismissed.

## B. Discrimination

Swidnicki's Complaint charges Brunswick with national origin and gender discrimination in violation of Title VII and Section 1981. Because claims brought under Section 1981 are evaluated on summary judgment under the same standards as Title VII claims, Swidnicki's discrimination claims may be reviewed together. *See, Keri v. Bd. of Trs. of Purdue Univ.,* 458 F.3d 620, 641 n.5 (7th Cir. 2005).

Title VII "prohibits employment discrimination on the basis of race, color, religion, sex, or national origin." *Ricci v. DeStefano,* 557 U.S. 557, 557 (2009) (citing 42 U.S.C. § 2000e-2(a)). Unlawful discrimination may be demonstrated either through direct or circumstantial evidence of intentional discrimination, or indirectly through a subset of circumstantial evidence that conforms to the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801-03 (1973). *See, Sylvester v. SOS Children's Vills. Ill., Inc.,* 453 F.3d 900, 902-03 (7th Cir. 2006) (explaining the distinctions

between direct and indirect methods of proof). Swidnicki appears to proceed under both methods.

### 1. Direct Method

Under the "direct" method of proof, a plaintiff must offer either "direct evidence of animus – the so-called 'smoking gun' – or circumstantial evidence which establishes a discriminatory motive on the part of the employer through a longer chain of inferences." *Van Antwerp v. City of Peoria, Ill.,* 627 F.3d 295 (7th Cir. 2010). Direct evidence is rare and "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004). Circumstantial evidence may include (1) "suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group," (2) "evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment," or (3) "evidence that the employee was qualified for the job in question but passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Good v. Univ. of Chicago Med. Ctr.,* 673 F.3d 670, 675 (7th Cir. 2012).

Swidnicki's evidence of discrimination centers entirely on Terrien's conduct – specifically, his comments about vendors having difficulty understanding her accent, his remarking on the fact that many Polish people work "in cleaning services," his decision to

change her name on a dry-erase board from an Americanized nickname to her full Polish name, his refusal to allow her to use the company's new system for tracking deliveries, and his off-handed comment about a certain female employee being the equivalent of only "half a man." Even assuming that this conduct is sufficient proof of Terrien's alleged animosity toward Swidnicki's national origin and gender, there is no evidence suggesting that Terrien was at all involved in Brunswick's decision to terminate her employment.

Derogatory remarks made by a non-decisionmaker or someone without influence generally "do not suffice as evidence of discriminatory intent." *Lucas v. Chicago Trans. Auth.,* 367 F.3d 714, 730 (7th Cir. 2004). Although Swidnicki apparently "felt" that Terrien might have played a role in her termination, (Pl.'s Resp. to Def.'s Stmt. of Uncontroverted Facts ("Pl.'s Resp. Stmt.") ¶ 47, ECF No. 23), her belief in that regard is purely speculative and, in any event, unsupported by any facts in the record. It is true that Terrien gave Swidnicki an arguably negative performance evaluation and later issued her a PDN, but there is no indication that he influenced Brunswick's decision to fire her, whether through his reviews of her work (however unfavorable they may have been), the issuance of the PDN, or some other means. Nor is there evidence that Terrien's alleged discriminatory animus was intended to cause an adverse employment action or was a proximate cause of Swidnicki's termination. *See, Staub v. Proctor Hosp.,* ---

U.S. ---, 131 S.Ct. 1186, 1194 (2011). Rather, the undisputed facts show that the decision to terminate Swidnicki's position came only as a result of her exhausting her available leave time under Brunswick's policies more than six weeks after she failed to return to work. Because Swidnicki has identified no discriminatory behavior in connection with Brunswick's decision to fire her, her claims fail under the direct method of proof.

## 2. *Indirect Method*

To proceed under the "indirect" method of proof, the plaintiff first must establish a *prima facie* case of unlawful discrimination. *Fane v. Locke Reynolds LLP,* 480 F.3d 534, 538 (7th Cir. 2007). In setting forth a *prima facie* case, an employee must demonstrate that (a) she is a member of a protected class, (b) her job performance met the employer's legitimate expectations, (c) she was subjected to an adverse employment action, and (d) similarly situated employees outside of the protected class were treated more favorably. *Naficy v. Ill. Dep't of Human Servs.,* 697 F.3d 504, 511 (7th Cir. 2012). If the plaintiff successfully makes out a *prima facie* case, "a presumption of discrimination arises, and the employer must articulate a legitimate, nondiscriminatory reason for its employment action." *Moser v. Ind. Dep't of Corr.,* 406 F.3d 895, 900 (7th Cir. 2005). Finally, if the employer provides a nondiscriminatory rationale for its conduct, the burden shifts back to the plaintiff to prove that the employer's proffered explanation

merely was a pretext for discrimination.  *Stockett v. Muncie Ind.*
*Trans. Sys.,* 221 F.3d 997, 1001 (7th Cir. 2000).

The first two elements of Swidnicki's *prima facie* case are not
in dispute.  (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s
Mem.") at 3-4, ECF No. 16).  Brunswick contends, however, that
Swidnicki is incapable of demonstrating either that she was subject
to any adverse employment action or that any similarly situated
employees received more favorable treatment.  (*Id.* at 4-7).

Without question, termination is an adverse employment action.
*O'Neal v. City of Chicago,* 392 F.3d 909, 911 (7th Cir. 2004).
However, Swidnicki has failed to present evidence regarding any
similarly situated non-Polish employee who engaged in comparable
conduct and was not fired.  A similarly situated employee is one
whose performance, qualifications, and conduct are directly
comparable to the plaintiff's in "all material respects."  *Dandy v.*
*United Parcel Serv., Inc.,* 388 F.3d 263, 274 (7th Cir. 2004).
Although a comparator need not be identical to the plaintiff, he or
she must at least have been subject to the same standards or
policies and engaged in similar misconduct of "comparable
seriousness."  *Coleman v. Donahoe,* 667 F.3d 835, 848-850 (7th Cir.
2012).  Because Swidnicki has not identified any similarly situated
non-Polish employee who failed to return to work after exhausting
available leave time (or engaged in similar conduct) and received
more favorable treatment, she consequently cannot establish a *prima*

*facie* case of discrimination based on Brunswick's termination of her position.

Swidnicki argues that her termination was not the only adverse employment action she was subjected to while at Brunswick. Specifically, she contends that she suffered adverse action after Terrien refused to allow her to use the company's new computer system and, later, when he issued her a PDN following an allegedly negative mid-year performance review. However, "not everything that makes an employee unhappy is an actionable adverse action." *Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 780 (7th Cir. 2007) (citation omitted). Rather, the employer's action must be "materially adverse" and cause "more than a mere inconvenience or an alteration of job responsibilities." *Kersting v. Wal-Mart Stores, Inc.,* 250 F.3d 1109, 1115 (7th Cir. 2001). Thus, classic examples of adverse employment action include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Hottenroth v. Village of Slinger,* 388 F.3d 1015, 1029 (7th Cir. 2004).

Although Swidnicki may have felt that Terrien was holding her back by not placing her on the company's new computer system, which she believed was "the up and coming thing at Brunswick," (Pl.'s Opp. Mem. at 15), there is no evidence that his decision diminished her job responsibilities in any material way or otherwise negatively affected her career prospects. While the Seventh

Circuit has held that an adverse action may be established based upon an employer's denial of a valuable work opportunity, it did so under circumstances where the plaintiff was refused permission to attend a "once in a lifetime" training event that caused her to lose the potential for "many hours of overtime" and would have advanced her career substantially by opening unique work opportunities for her. *Lewis v. City of Chicago,* 496 F.3d 645, 653-54 (7th Cir. 2007). Here, there is nothing to suggest that Swidnicki was being passed over on any sort of exclusive career opportunity. Indeed, as one of Swidnicki's co-workers explained, the new model did not even "go live" until June 2011 – six months after Swidnicki left Brunswick – and employees were being trained on the system one at a time. (Pl.'s Ex. HH (Junge Dep.) at 32, ECF No. 21-6). Terrien told Swidnicki that she would be trained "soon," (Def.'s Ex. A (Swidnicki Dep.) at 115, ECF No. 15-1), and there is no indication that Swidnicki eventually would not have been transitioned over to the new model prior to it going live. Moreover, Terrien stated to Swidnicki that he was waiting to transfer her to the new system because he valued her skills in the classic model, (*see,* Def.'s Ex. A (Swidnicki Dep.) at 115, ECF No. 15-1), and Swidnicki has offered no evidence that this plainly legitimate explanation was a pretext for discrimination.

As for Terrien's allegedly negative mid-year performance evaluation and the issuance of the PDN, neither were adverse employment actions. At the outset, "unfair reprimands or negative

performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions." *Grube v. Lau Indus., Inc.,* 257 F.3d 723, 729 (7th Cir. 2001). Thus, even to the extent that Terrien's evaluation of Swidnicki may have contained criticism of her performance, it cannot be considered a materially adverse action because it had no apparent effect on the terms of Swidnicki's employment.

Similarly, the PDN did not alter Swidnicki's status as an employee and was not an adverse action. Swidnicki analogizes the PDN she received to a form of "probation," following which her termination would have been inevitable. Although the Seventh Circuit has in the past suggested that placing an employee on probation "might" constitute an adverse employment action, *see, e.g., Thompson v. Mem. Hosp. of Carbondale,* 625 F.3d 394, 407 (7th Cir. 2010), the PDN in this case does not rise to that level.

In *Thompson,* for example, the court was satisfied that the plaintiff had presented sufficient evidence of an adverse action where his employer placed him on a probationary status under which his work schedule was altered, additional testing was imposed as a condition of continued employment, he was assigned to perform certain additional duties, and he was not permitted to work absent continuous supervision. *Thompson,* 625 F.3d at 399-408. The court cautioned, however, that it was "not hold[ing] that any imposition of a probationary period constitutes an adverse employment action." *Id.* at 408.

In contrast to the probationary regime that had been imposed on the plaintiff in *Thompson,* the PDN in this case involved no additional employment conditions and did not alter Swidnicki's job duties in the least.  Rather, the PDN merely outlined a number of alleged deficiencies in her performance and set forth a timeline within which she was to demonstrate improvement.  In this respect, the PDN is more closely akin to what have sometimes been termed "performance improvement plans," which do not constitute adverse employment action absent any tangible change in employment status.  *See, Cole v. Illinois,* 562 F.3d 812, 816 (7th Cir. 2009) (improvement plan that did not deprive plaintiff of "responsibility, hours, pay, or any other relevant accoutrement of her position" was not an actionable adverse action).  Because the basic terms and conditions of Swidnicki's employment at Brunswick were unaffected by the PDN, its issuance was not an adverse employment action.

Although Swidnicki's failure to establish a *prima facie* case is enough to conclude the *McDonnell Douglas* analysis, it can be noted as well that Swidnicki has presented no evidence to support her allegation that Brunswick's stated reason for firing her was pretextual.  Swidnicki does not dispute that she failed to return to work after expending all of her leave time available under Brunswick's policies and, as previously discussed, she has identified nothing that links Terrien's allegedly discriminatory conduct to Brunswick's decision to fire her.  Thus, even if she had

set forth a properly supported *prima facie* case, her discrimination claims still would fail.

Accordingly, summary judgment is granted in favor of Brunswick on Swidnicki's discrimination claims.

## C. FLSA Retaliation

In addition to her discrimination claims, Swidnicki alleges that Terrien retaliated against her for reporting him to Stame after he allegedly directed her not to record overtime hours she had worked. Swidnicki argues that Terrien's retaliation is evidenced by his "increased badgering" of her, his refusal to allow her to use the company's new delivery system, his making of allegedly false statements in connection with her PDN, and Brunswick's ultimate decision to terminate her employment. (Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp. Mem.") at 14-19, ECF No. 20).

The FLSA forbids employers from discharging or otherwise discriminating against an employee who files a complaint, institutes a proceeding, or testifies in a proceeding regarding a complaint made under the Act. 29 U.S.C. § 215(a)(3). Oral complaints made to company officials regarding FLSA violations are protected under the Act's anti-retaliation provision. *Kasten v. Saint-Gobain Performance Plastics Corp.,* --- U.S. ---, 131 S.Ct. 1325 (2011).

In order to establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in protected activity

under the FLSA, (2) she suffered an adverse employment action, and (3) there was a causal link between the two. *Bradford v. Village of Lombard,* No. 11 C 37, 2012 WL 1655966, at *2 (N.D. Ill. May 10, 2012) (citing *Stutler v. Ill. Dept. of Corr.,* 263 F.3d 698, 702 (7th Cir. 2001) and *Scott v. Sunrise Healthcare Corp.,* 195 F.3d 938, 940 (7th Cir. 1999)). Here, Swidnicki fails to establish any causal connection between her reporting of Terrien to Stame and her eventual termination.

Although Swidnicki contends that Terrien retaliated against her by making her life a "living hell" after she brought her overtime concerns to Stame, (Pl.'s Stmt. of Add. Facts ("Pl.'s Stmt.") ¶ 95, ECF No. 24), there is no evidence that Terrien was aware that Swidnicki had reported him. Indeed, neither Terrien nor Stame could recall ever having discussed Swidnicki's complaint about overtime and Swidnicki herself alleges that Stame never acted on her complaint. (*Id.*)

Terrien's lack of knowledge is fatal to Swidnicki's retaliation claim, however, since it is axiomatic that "an employer cannot retaliate when it is unaware of any complaints." *Sitar v. Indiana Dept. of Transp.,* 344 F.3d 720, 727. Because Swidnicki has failed to demonstrate any causal link between her complaint and her termination, summary judgment is granted on Swidnicki's FLSA retaliation claim. *See, e.g., Larsen v. Club Corp. of America, Inc.,* 855 F.Supp. 247, 253 (N.D. Ill. 1994) (plaintiff failed to establish causal link between her involvement in FLSA protected

activity and her employer's adverse action when the alleged retaliator was unaware of plaintiff's participation in protected activity).

### D.  Hostile Work Environment

#### 1.  *Sexual Harassment*

Swidnicki alleges that Davila's persistent inappropriate behavior created a hostile work environment.  "A sexually hostile or abusive work environment is a form of sex discrimination under Title VII."  *E.E.O.C. v. Mgmt. Hospitality of Racine, Inc.,* 666 F.3d 422, 432 (7th Cir. 2012).  To survive summary judgment on a hostile work environment claim based on sexual harassment, a plaintiff must show that:  "(1) she was subjected to unwelcome conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability."  *Roby v. CWI, Inc.,* 579 F.3d 779, 784 (7th Cir. 2009).

Swidnicki's allegations concerning the daily barrage of sexual comments that she received from Davila are disturbing.  By Brunswick's own concession, Davila's conduct was "not appropriate for any workplace."  (Def.'s Mem. at 14).  Nonetheless, Brunswick argues that Davila was a mere "equal opportunity harasser" and that Swidnicki therefore cannot show that Davila's bad behavior was directed at her because of her gender.

Title VII "does not cover the 'equal opportunity' or 'bisexual' harasser . . . because such a person is not *discriminating* on the basis of sex. He is not treating one sex better (or worse) than the other; he is treating both sexes the same (albeit badly)." *Holman v. Indiana,* 211 F.3d 399, 403 (7th Cir. 2000) (emphasis and parentheticals in original). In attempting to show that Davila's conduct was unrelated to Swidnicki's gender, Brunswick relies on a number of comments in which Davila allegedly referred to having sexual relations with certain male co-workers. Although Davila's sexually-charged comments sometimes concerned male co-workers and, on occasion, were remarks of the more general type that might have been addressed to the whole office, the majority of his comments were directed solely at Swidnicki.

In *Kampmier v. Emeritus Corp.,* the Seventh Circuit found harassing conduct aimed at both men and women to be actionable where the female plaintiff was subjected to harassment that was "far more severe and prevalent" than the conduct directed at other male co-workers. *Kampmier v. Emeritus Corp.,* 472 F.3d 930, 940-41 (7th Cir. 2007). In such circumstances, the court stated, the plaintiff could "at the least . . . raise[] a genuine issue of material fact as to whether [the] alleged harassment was because of [her] sex." *Id.*

Davila's comments toward Swidnicki can be characterized as significantly more severe and prevalent than those that may have

been directed at male employees. While Davila may have made occasional homosexual references concerning male co-workers, there is no evidence that any of those comments were directed toward male employees. In fact, many appear to have been addressed to Swidnicki, perhaps in a juvenile effort to disgust her. In any event, Davila's comments regarding other male employees were blander (compare, for example, "Bob doesn't like me anymore, Brian still loves me" with "Kathy, do you like to swallow" or "Kathy, do you want to taste my schmeckel?") and far less frequent than the repeated unsavory sexual remarks he made toward Swidnicki. In these circumstances, it would not be unreasonable for a jury to conclude that Swidnicki was harassed because of her sex.

Brunswick also argues that Davila's alleged conduct was not so "severe or pervasive" that it transformed the workplace into an objectively hostile environment. To be actionable under Title VII, the harassing conduct must be either severe or pervasive, although it need not be both. *See, Turner v. The Saloon, Ltd.,* 595 F.3d 679, 686 (7th Cir. 2010). In addition, the plaintiff must demonstrate that her work environment was both subjectively and objectively offensive – in other words, "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Cerros v. Steel Techs., Inc.,* 288 F.3d 1040, 1044 (7th Cir. 2002).

It is undisputed that Swidnicki subjectively perceived Davila's conduct to be unwelcome and severe. The only question is

whether Davila's conduct was objectively offensive. "[D]rawing the line between what is and is not objectively hostile is not always easy." *Turner*, 595 F.3d at 686 (quotation marks omitted). Conduct involving episodes of inappropriate touching undoubtedly is among the more serious types of abuse, *see, Worth v. Tyler,* 276 F.3d 249, 268 (7th Cir. 2001), but sexual harassment also can and does occur in the absence of any unwanted physical contact. *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 789 (7th Cir. 2007) (summary judgment inappropriate where employer "made at least eighteen sexist or sexual comments in less than a year's time and that similar comments were made 'very often'").

Brunswick seeks to dismiss Davila's conduct as being "sophomoric," but ultimately harmless. Certainly, employees are expected to be able to withstand "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Baskerville v. Culligan Intern. Co.,* 50 F.3d 428, 430 (7th Cir. 1995). The conduct that is alleged here, however, was far from "occasional" and, in many cases, exceeded mere vulgarity. Davila made repeated references to his genitals, including asking Swidnicki to hold or "taste" them. He whispered inappropriate comments to her and, on more than one occasion, he disturbingly pulled out the waistband of his pants so that he could look at his genitals while standing in front of her. Making between 20 and 30 sexually-charged comments each day, his conduct was nothing short

of unrelenting. A jury properly could conclude that a reasonable person would find this type of environment to be offensive.

Brunswick relies extensively on this Court's decision in *Hampton v. Potter,* No. 01 C 9077, 2003 WL 22290404 (N.D. Ill. Oct. 3, 2003), which granted summary judgment on a claim based upon conduct Brunswick believes to have been more extreme. In *Hampton,* the plaintiff complained that the alleged harasser made lewd tongue gestures at her once every other week, brought a book about oral sex to work, asked the plaintiff if he could touch her breasts, blew into the telephone when she answered it, and once brushed a plastic mail tub against her buttocks. *Id.* at *5. The frequency of a harasser's alleged offensive behavior, however, is highly relevant to an assessment of its impact, *Baskerville,* 50 F.3d at 431, and these "infrequen[t]" incidents were spread across a period of six years. *Hampton,* 2003 WL 22290404, at *6. In contrast, Davila's conduct was near-constant and persisted for many months. By at least one other co-worker's account, his comments were extraordinarily disruptive, (Pl.'s Resp. Stmt. ¶¶ 164-66), and there is ample evidence upon which a reasonable jury could conclude that they were severe or pervasive. Therefore, there is, at a minimum, a genuine factual question as to whether Davila's conduct created an objectively hostile work environment. *See, e.g., E.E.O.C. v. Continental Airlines, Inc.,* No. 04 C 3055, 2006 WL 14510, at *10-11 (N.D. Ill. Jan. 3, 2006) (summary judgment denied where employer made fifteen to twenty gender-related comments in a

year).  For this reason, summary judgment on Swidnicki's sexual harassment claim is denied.

## 2. National Origin Discrimination

Swidnicki alleges that she was subjected to a hostile work environment based upon Terrien's alleged animus toward her national origin.  Brunswick takes issue with the fact that her complaint omits any mention of such a claim, but a plaintiff ordinarily is not required to plead specific legal theories where the defendant has fair notice of the types of claims the plaintiff is pursuing. *See, Jajeh v. County of Cook,* 678 F.3d 560, 567 (7th Cir. 2012). In any event, the point is not worth exploring further, as Swidnicki's claim clearly is without merit.  Even when viewed in the light most favorable to Swidnicki, Terrien's conduct does not approach what reasonably might be considered severe or pervasive behavior.  The handful of tepid comments about her accent, the remark about Polish people working in cleaning services, and the isolated incident when Terrien referred to Swidnicki by her birth name all are so insignificant that no reasonable juror could find this conduct to be objectively offensive.  Accordingly, summary judgment is granted in favor of Brunswick on Swidnicki's national origin hostile work environment claim.

## E.  Constructive Discharge Claim

Finally, Swidnicki alleges that conditions at Brunswick were so intolerable that she effectively was forced to resign.  This often is referred to as a "constructive discharge."  Absent

extraordinary circumstances, employees are expected to remain employed while seeking redress for alleged workplace violations. *Witte v. Wisc. Dep't of Corr.,* 434 F.3d 1031, 1035-36 (7th Cir. 2006). Thus, to prevail on a constructive discharge claim, an employee must show that "quitting was the only way [she] could extricate herself from the intolerable conditions." *Gawley v. Indiana Univ.,* 276 F.3d 301, 315 (7th Cir. 2001). In doing so the plaintiff is required to "demonstrate a work environment that is even more egregious than that needed for a hostile work environment" and one that "from the standpoint of a reasonable employee, had become unbearable." *Thompson v. Mem'l Hosp. of Carbondale,* 625 F.3d 394, 401-02 (7th Cir. 2010).

"[I]t is difficult for a plaintiff to show constructive discharge." *Cooper-Schut v. Visteon Automotive Sys.,* 361 F.3d 421, 428 (7th Cir. 2004). Although Swidnicki has demonstrated sufficient evidence of a hostile work environment to proceed beyond summary judgment on her sexual harassment claim, she has not met the higher standard of showing that her work conditions objectively were unbearable. Constructive discharge typically is found only in cases involving threats of physical harm or truly outrageous emotional abuse. *See, e.g., Taylor v. W. & S. Life Ins. Co.,* 966 F.2d 1188, 1191 (7th Cir. 1992) (constructive discharge where boss held a pistol to plaintiff's head); *Brooms v. Regal Tube Co.,* 881 F.2d 412, 417 (7th Cir. 1989) (human resource manager grabbed plaintiff and threatened to kill her); *Porter v. Erie Foods Int'l,*

*Inc.,* 576 F.3d 629, 640 (7th Cir. 2009) (presence of multiple nooses in the workplace and implied threats of physical violence). Davila's harassment, even if highly offensive and extremely pervasive, simply is not the type of conduct that would justify a reasonable person to feel they had no other choice but to quit.

Although a constructive discharge may also occur when "an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated," *Chapin v. Fort-Rohr Motors, Inc.,* 621 F.3d 673, 679 (7th Cir. 2010), Swidnicki has made no showing that Brunswick ever communicated to her that she would be fired. Swidnicki may have believed that once she had been issued the PDN her fate at Brunswick had all but been sealed, but there is no evidence to suggest that this was the case. Accordingly, summary judgment on Swidnicki's constructive discharge claim is granted.

## IV. CONCLUSION

For the reasons stated herein, Brunswick's Motion for Summary Judgment [ECF No. 15], is granted in part and denied in part.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Date:3/6/2014

- 27 -